FILED
CLERK, U.S. DISTRICT COURT

20 JUN 00 PM 12: 52

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>ROBERT WAYNE FISCUS,<br><br>    Defendant. | ORDER<br><br><br><br>Case No. 2:99CR627C |

On or about August 19, 1998, a grand jury indicted Defendant Robert Wayne Fiscus

under 18 U.S.C. § 2252A(a)(5)(B) for the knowing possession of images of child pornography

that had been shipped, mailed, and/or transported in interstate and/or foreign commerce. This

matter comes before the court on Fiscus's motion to suppress.

Fiscus filed this motion to suppress all evidence discovered on his computer and diskettes

on the grounds that his Fourth Amendment rights had been violated. As the evidentiary hearings

progressed, Fiscus's argument has come to incorporate a number of bases for suppression: (1) the

initial search of his house was invalid because the parole officers lacked reasonable suspicion to

conduct a parole search; (2) the seizure of his computer and his diskettes was invalid; and (3) the

subsequent search of his computer and diskettes was unconstitutional. In addition, Fiscus moves

to suppress certain incriminating statements on the grounds that those statements were not

1

voluntarily made.  The government contends that the search and seizure of Fiscus's computer and diskettes were made during a valid parole search supported by reasonable suspicion and that his incriminating statement was voluntarily given.

Hearings on Fiscus's motion to suppress were held on March 3, March 20, and June 8, 2000.  Having fully considered the arguments of counsel, the submissions of the parties, and applicable legal authority, the court now enters the following order.

<u>Background</u>

On March 2, 1992, Fiscus was paroled by the South Carolina Board of Probation, Parole, and Pardon Services.  On April 1, 1994, the Utah Board of Pardons agreed to direct and supervise Fiscus's continuing parole.  According to the Certificate of Parole from South Carolina, Fiscus's parole was to end on July 26, 1999.

On May 5, 1999, Officer Scott Healy, with the Orem Police Department, received a phone call from Susan Turner who said that her friend Damien Herbert had seen child pornography on Fiscus's computer.  According to Turner, Herbert saw the child pornography images while he was repairing Fiscus's computer and then deleted the files from the computer's hard drive.  On June 9, 1999, Herbert called the Orem Police Department himself, and talked with Officer Todd Moake.  Herbert stated that while he was fixing Fiscus's computer, he saw images that he believed to be child pornography.  Herbert told Moake that he looked at the images and was so disgusted by what he saw that he deleted the files.  Herbert also informed Moake that he believed that Fiscus was on parole for a sex crime.  (<u>See</u> Mar. 3, 2000 Tr. at 11.)

After speaking with Herbert, Moake did a computerized search to determine if Fiscus was on parole. Moake learned that Fiscus was on parole for sexual abuse of a child, and that his parole officer was Jim Mower. Moake called Mower, eventually speaking with him on July 20, 1999. Mower told Moake that he had been told about the two calls, and planned to conduct a parole search that evening. Moake agreed to accompany Mower on the visit. Moake also said that he would bring Steve Bulkley, a Systems Analyst with the Provo Police Department, to help with a search of Fiscus's computer.

Moake, Mower, and Bulkley went to Fiscus's home during the evening of July 20, 1999, and informed Fiscus that it was their intention to conduct a final parole check. Mower told Fiscus that they would be searching his computer for inappropriate photos. (See id. at 15–16.)

Before the agents began searching, they asked Fiscus whether he objected to a search of the rest of his house. Fiscus testified that he responded "You're not going to find anything — anything there because everything is on the computer." (Tr. of Mar. 20, 1999 Hr'g at 88.)

According to Mower, Fiscus told the officers that they could look at his computer. (See Tr. of Mar. 3, 1999 Hr'g at 95) ("I asked him if we had consent to search [the computer] and to look in there, and he told me yes.")[1] Fiscus claims that he never consented to the search. Morrow testified that Fiscus also stated that "there may be some inappropriate pictures in the computer." (Id.)[2]

---

[1] The other officers also testified that Fiscus consented to the search. (See id. at 16, 65.)

[2] Officers Bulkley and Moake also recounted this statement. According to Bulkley, "We started to set up [the computer equipment], and the defendant said that he was embarrassed of what we would find on the computer." (Id.) Moake testified that Fiscus told them that he "was embarrassed that we'd have to look at that. That there were photos that were on there that were not of a nice nature, I believe is the way he put it." (Id. at 16.)

Bulkley sat down at the computer and moved the mouse, which took the screen saver off the monitor. Bulkley noted that the wallpaper on the desktop was of a "sexually aroused" adult nude male.[3]  (See id. at 65.)  Because the computer was missing a port, Bulkley was unable to view the computer hard drive at that time.  While examining the hard drive, Bulkley found some computer diskettes labeled "Bob's Pics."  Mower either told Fiscus that they would need to take the computer or asked him for permission to take the property.[4]

The next morning (July 21, 1999), Moake, Mower, and Bulkley met to review the hard drive and the diskettes.  The officers testified that "Everything that was on the hard drive picturewise that we were — that we found were of an adult nature."  (Id. at 24.)  On the diskettes, however, the officers found "a handful of photos which we believed to be child pornography."  (Id. at 24.)  That day, Moake telephoned Don Daufenbach, an agent with the U.S. Customs Service.  (Tr. of Mar. 20, 2000 Hr'g at 50.)  Daufenbach met with Moake later in the week to review the images found on Fiscus's diskettes.  On September 2, 1999, Daufenbach again reviewed the diskettes in order "to make sure that there was a basis to file the charge."  (Id. at 59.)

On July 22, 1999, Mower went to Fiscus's home and asked him to sign a document requesting an extension of his parole.  Fiscus apparently believed that once South Carolina

---

[3]Moake testified what a computer "wallpaper" is: "The wallpaper would be the screen that every other program, if you had windows, would be on.  It would be that back thing that would be there."  (Id. at 16.)  The court understands wallpaper to be the image on the desktop that replaces the "normal" background when the computer is turned on.  Users are able to personalize their wallpaper with whatever image they choose.

[4]There is some disagreement as to whether Fiscus consented to the seizure of his property.  While Bulkley and Moake both testified that Fiscus consented, (see Tr. of Mar. 3, 2000 Hr'g at 46-47, 67), Mower seemed less certain that Fiscus actually consented to the seizure.  (See Tr. of Mar. 20, 2000 Hr'g at 4, 34-37.)

4

officials approved the form, his parole would be extended for one year. (Id. at 80.)  In fact,
South Carolina had already processed Fiscus's forms and his parole was not extended.  Fiscus's
parole ended on July 26, 1999 without being revoked.

On October 13, 1999, Moake, Daufenbach, and Mower went to Fiscus's place of
employment in Orem, Utah.  Daufenbach asked Fiscus where they could talk, and Fiscus led the
officers to a back office.  In an encounter that lasted between forty minutes to an hour,
Daufenbach asked Fiscus questions about the images the officers had found on his diskettes.
During the interview, Fiscus made certain incriminating statements concerning the files.

Analysis

A.      The Computer and the Diskettes

1.      Search of the House

A search (even in non-parolee situations) may be justified by the voluntary consent of the
person to be searched.  See Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973) (voluntary
consent constitutes waiver of Fourth Amendment rights).  To determine whether consent was
voluntary, courts must examine the totality of the circumstances surrounding the consent.  See id.
at 227; United States v. McRae, 81 F.3d 1528, 1536–37 (10th Cir. 1996).  The burden is with the
government to prove the consent was voluntary.  United States v. Patten, 183 F.3d 1190, 1194
(10th Cir. 1999).  The Tenth Circuit has developed a two-prong test for determining the
voluntariness of a consent to search: the government must (1) "proffer 'clear and positive
testimony that consent was unequivocal and specific and freely and intelligently given'" and (2)

5

"prove that this consent was given without implied or express duress or coercion." McRae, 81

F.3d at 1537 (internal citations omitted).

The first prong requires the court to determine whether consent was actually given. All

of the officers testified that Mower knocked on Fiscus's door and was invited in by Fiscus.

(See Tr. of Mar. 3, 2000 Hr'g at 15, 65, 94.)  In addition, all of the officers testified that Fiscus

was told about the parole search and consented to a search of his computer without hesitation.

(See id. at 16, 65, 95.)

Fiscus testified that he never expressly consented to a parole search:

Q:    And did anyone ask you whether they could search your computer?
A:    No, they did not.
Q:    What did they say to you about your computer?
A:    They just said, "We need — we need to look at your computer."
Q:    No one ever asked you if that was all right with you?
A:    No.  They just said, "We're here to look at this."
Q:    Did anyone ask you if they could look at your diskettes?
A:    No, they didn't.
    . . .
Q:    Did anyone ask for consent to search your house?
A:    I believe Officer Mower did.  He just said, "Do you mind if I go check the
      rest of the place?"  And he walked off and looked around my apartment.

(Id. at 87.)

Evaluating the credibility of the witnesses and the weight given to the evidence presented

at a motion hearing is a matter for the trial judge.  United States v. Broomfield, 201 F.3d 1270,

1273 (10th Cir. 2000).  There is little reason to disbelieve the consistent testimony of the three

officers that Fiscus expressly consented to the search of his house and his computer.  Despite

Fiscus's contention that he never expressly consented to a search, the consistent testimony of the three officers adequately demonstrates that Fiscus consented to a parole search.[5]

The second prong of the test for voluntariness requires the court to determine whether the consent was given without duress or coercion. See McRae, 81 F.3d at 1537. In considering whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant. See United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994); see also Schneckloth, 412 U.S. at 226–27. No single factor is dispositive. See Schneckloth, 412 U.S. at 226–27.

Fiscus testified that on the evening of the search, he was sober, coherent, and understood the questions asked by the officers. (See Tr. of Mar. 20, 2000 Hr'g at 83–84.) He has attended some college and appears mentally capable. (See id. at 83.) As evidenced by his parole status, Fiscus has had prior dealings with police officers.[6] When asking for consent, the officers did not verbally or physically threaten Fiscus in any way.

Two factors possibly balance in favor of finding that Fiscus's consent was not voluntary. First, Mower was not entirely forthcoming about the reason for the search. The officers testified that Mower told Fiscus that the officers were at his house to do a final parole check. When asked what he told Fiscus, Mower testified that "He was about to get off parole, and I needed to make

---

[5]While Fiscus contends that he never affirmatively consented to a parole search of his house, the fact that he did not object may be an indication of implied consent to search. See United States v. Flores, 48 F.3d 467, 469 (10th Cir. 1995) (recognizing implied consent to search).

[6]Fiscus testified that after he was arrested in South Carolina for his underlying parole crime, he had been advised of his Miranda rights. (See id. at 84.)

sure that everything was right with the conditions of his parole prior to him getting off parole." (Id. at 94.)[7]  While this statement could be correct, the circumstances surrounding the search indicate that the officers were also following up on a tip of a possible parole violation.  On cross-examination, Mower admitted that he never told Fiscus why he wanted to search the computer and never mentioned the two tips that he had received about possible parole violations.  (See id. at 32.)

In considering whether a defendant's decision to speak to officers was involuntary due to official deception or misrepresentation, the Tenth Circuit has held that a defendant must "produce clear and convincing evidence that the agents affirmatively mislead him as to the true nature of their investigation.  [The d]efendant must also prove that the misinformation was material in his decision to speak with the agents."  United States v. Erekson, 70 F.3d 1153, 1158 (10th Cir. 1995).  Furthermore, "Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead."  Id.  Even assuming that Mower's statements could be considered "deceptions or misrepresentations," Fiscus has not met this burden.

A second factor balancing in favor a finding of involuntariness is Fiscus's contention that he believed that he had no right to refuse consent.  (See Tr. of Mar. 20, 2000 Hr'g at 79, "If [officers] arrive at my home, . . . I have to let them in and let them search whatever they may.")  The Tenth Circuit has held that a suspect's belief that he must consent is not conclusive.  See

---

[7]According to Moake, Mower told Fiscus that "he was there to do one of his final parole checks, as he was — as he knew that Mr. Fiscus was being prepared to be released from parole."  (Tr. of Mar. 3, 2000 Hr'g at 15.)

United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996) (consent to search voluntary even though officers did not inform suspect of right to refuse consent). Furthermore, the Tenth Circuit has expressly rejected "the notion that [a suspect's] attitude toward police, from whatever source, can constitute . . . a . . . subjective characteristic" relevant to the "voluntariness of the person's consent." United States v. Zapata, 997 F.2d 751, 759 (10th Cir. 1993) (holding that a suspect's attitude toward authority is irrelevant to the issue of voluntariness since attitude is "inherently unverifiable and unquantifiable").

This case lacks any evidence of coercive threats, promises, inducements, display of a weapon, or use of a commanding manner of tone of voice. Cf. United States v. Waupekenay, 973 F.2d 1533, 1536 (10th Cir. 1992) (consent to search was not voluntary when individual was warned by officers that she would be thrown in jail if she did not cooperate and officers drew weapons). The totality of the circumstances indicates that Fiscus's consent was not the product of coercion or duress and, therefore, the search of his home and his computer was valid.

    2.      Seizure of the Computer and the Diskettes

Fiscus argues that even if the search of his house was valid, the seizure of his computer and his diskettes was unjustified and violated his Fourth Amendment rights.

Although Fourth Amendment cases sometimes refer indiscriminately to searches and seizures, "there are important differences between the two." Texas v. Brown, 460 U.S. 730, 747 (1983) (Stevens, J., concurring) (noting that searches threaten the interest in maintaining personal privacy, while seizures threaten the interest in retaining possession of property). In the absence of a warrant, the "most appropriate seizure standard appears to come from the rules governing

9

'plain view' seizures." United States v. Giannetta, 909 F.2d 571, 578 (1st Cir. 1990). The plain

view doctrine allows police to seize an object when (1) the police have a prior justification for

being in a position to see the item in plain view; (2) the incriminating nature of the item is

"immediately apparent" to the seizing agent; and (3) the officer must have lawful right of access

to the object itself. See United States v. Janus Indus., 48 F.3d 1548, 1554–55 (10th Cir. 1995).

The first and third elements are satisfied by the analysis above and the second factor is

considered below.

In general, "probable cause is required in order to invoke the plain view doctrine."

United States v. Padilla, 819 F.2d 952, 962 (10th Cir. 1987); see also United States v. Soussi, 29

F.3d 565, 572 (10th Cir. 1994) (same). Since (as analyzed below) the officers' decision to seize

Fiscus's computer and diskettes was supported by probable cause, the court need not decide

whether a lower standard for plain view seizures applies during parole searches. Accord

Giannetta, 909 F.2d at 578–79 (considering, but not deciding, what standard applies since the

more stringent probable cause standard was met).

Probable cause does not require certainty. See Brown, 460 U.S. at 742. The government

must show that "the facts available to the officer would 'warrant a man of reasonable caution in

the belief' that certain items may be contraband . . . or useful as evidence of a crime. . . ." Id.

(internal citations omitted); see also United States v. Corral, 970 F.2d 719, 724 (10th Cir. 1992).

"A 'practical, nontechnical probability' that incriminating evidence is involved is all that is

required." Brown, 460 U.S. 730, 742 (internal citations omitted); see also Corral, 970 F.2d at

724.

In this case, the following factors support a conclusion that the incriminating character of the computer and diskettes was "immediately apparent": (1) when told that his house would be searched, Fiscus said, "You're not going to find anything — anything there because everything is on the computer;" (Tr. of Mar. 20, 2000 Hr'g at 88); (2) the officers testified that at some point during the search, Fiscus indicated that there might be inappropriate or embarrassing pictures on the computer (see Tr. of Mar. 3, 1999 Hr'g at 16, 65, 95); (3) the background wallpaper on Fiscus's computer was an image of a nude adult male; (4) the computer diskettes were labeled "Bob's Pics," understood by the officers to be short for "Bob's Pictures"; and (5) the officers had two reliable tips that Fiscus had earlier had child pornography on his computer.

Considered together, the five factors (particularly Fiscus's statements that "everything is on the computer" and that embarrassing pictures might be found on the computer) establish probable cause to believe that images of child pornography might be found on Fiscus's computer. Only one of the five factors (the name on the label) directly relates to the "Bob's Pics" diskette itself. However, due to the relationship between diskettes and computers and the fact that the diskette was found within arms-reach of the computer, the officers were justified in believing there was likely some connection between the contents of the diskette and the hard drive on the computer. Since there was sufficient probable cause to believe that both the computer and the diskettes contained incriminating evidence, the seizure of this property did not violate Fiscus's Fourth Amendment rights.

3.    Search of the Computer and the Diskettes

Fiscus next argues that the search of his computer and diskettes the day after they were taken from his home and, later, on September 2, 1999, violated his Fourth Amendment rights since the officers did not obtain a warrant.  While courts recognize the need for some warrentless searches, Fiscus contends that since no exigent circumstances existed after the officers had possession of his property, the officers were obligated to obtain a valid search warrant.

In support of this point, Fiscus relies on United States v. Carey, 172 F.3d 1268 (10th Cir. 1999).  In Carey, officers validly seized a computer during a search of the defendant's residence for evidence of drug dealing.  See id. at 1270.[8]  The computers were taken to the police station and a warrant was obtained by the officers.  The warrant allowed the limited search for "names telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances."  Id.  Although the searching officers were unsuccessful in their search of the computers for files that could be related to drug dealing, they did inadvertently find some files that contained child pornography.  See id. at 1271.  Without obtaining a second warrant, the officers began searching for (and eventually found several) child pornography files.  The Tenth Circuit held that the officers' failure to obtain a new warrant to search for child pornography violated the defendant's Fourth Amendment rights.  See id. at 1276.

According to the Tenth Circuit, when the searching officer expanded the scope of his search of the computers, "he was in the same position as the officers had been when they first wanted to search the contents of the computers for drug related evidence.  They were aware they

---

[8]In Carey, the defendant consented to a search of his house and consented to the removal of any property that "shall be essential in the proof of the commission of any crime. . . ."  Id. at 1270.  Seizure of the computers was justified since the officers apparently believed that they would be "subject to forfeiture or evidence of drug dealing."  Id.

had to obtain a search warrant and did so." Id. at 1273 (emphasis added).  Despite the fact that the computers were validly seized, the Tenth Circuit recognized that the defendant's continuing Fourth Amendment rights obligated the seizing officers to obtain a valid warrant before even the initial search of his computer (for evidence of drug dealing).

The Tenth Circuit's requirement that the officers obtain a warrant before searching in Carey makes sense because the defendant there had consented only to the seizure of his property, not to any subsequent search.  See id. at 1270.  In this case, however, the seizure of Fiscus's computer and diskettes is justified by probable cause to believe that it contained evidence of criminal wrongdoing.  Since the seizure was justified by a reasonable belief that child pornography would be found, the later search for evidence of child pornography was also valid.[9] Accord United States v. Tucker, Case No. 2:98CR425C, at 21 (D. Utah 2000) (unpublished opinion).

The subsequent searches of Fiscus's computer and diskettes, therefore, were valid.

B.      Incriminating Statements

On October 13, 1999, Moake, Daufenbach, and Mower talked with Fiscus at his place of employment.  Fiscus seeks to suppress certain incriminating statements made during the course of that interview.

---

[9]The holding in Carey instructs that a subsequent search for different incriminating evidence on Fiscus's computer would be invalid (because a computer contains such a wealth of information).  In this case, for example, a later search for evidence of drug dealing on Fiscus's computer would most likely be invalid under Carey. See Carey, 172 F.3d at 1276.  Carey counsels against extensive searches of computers beyond the original justification for the search; it does not stand for the proposition that search warrants are required every time computers are validly seized as evidence of criminal activity.

The Tenth Circuit has held that a defendant's statement must be suppressed if it was made involuntarily. See United States. v. Chalan, 812 F.2d 1302, 1307 (10th Cir. 1987).  When determining whether a statement was voluntarily made, the "ultimate inquiry" is whether "the confession [is] the product of an essentially free and unconstrained choice by its maker[.]  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Id. at 1307 (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).  Courts consider several factors in assessing whether a statement is voluntarily given, including (1) the age, education, and intelligence of the suspect; (2) the length and nature of his detention and questioning; (3) the use or threat of physical punishment; (4) whether Miranda warnings were given; and (5) the accused's physical and mental characteristics. United States v. Lugo, 170 F.3d 996, 1004 (10th Cir. 1999); see also Chalan, 812 F.2d at 1307–08; United States v. Harris, 956 F.2d 279, 1992 WL 33210, *4 (10th Cir. Feb. 21, 1992) (unpublished opinion).[10]  No single factor is determinative, and a court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." Lugo, 170 F.3d at 1004.

---

[10]18 U.S.C. § 3501 requires the following:
> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.  The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

Id.

As discussed above, Fiscus is educated and has some previous experience with the
criminal justice system.  He was questioned at his place of employment in the middle of the day,
and the interview lasted for less than an hour.  Fisucs was sober and unhandcuffed throughout the
questioning.  The officers never verbally or physically threatened him and none of the officers
touched him at any time.  Fiscus's apparent belief that he had not choice but to talk with the
officers is not a significant factor in evaluating whether his statements were voluntarily made.
See Zapata, 997 F.2d at 759 (holding that a suspect's attitude toward authority is irrelevant to the
issue of voluntariness since attitude is "inherently unverifiable and unquantifiable").

The totality of the circumstances demonstrate that Fiscus's statements were voluntarily
made, and therefore admissible.

Fiscus's motion to suppress is DENIED

SO ORDERED this __19__ day of June, 2000.

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
United States District Judge

15

ksj

United States District Court
for the
District of Utah
June 21, 2000

* * CERTIFICATE OF SERVICE OF CLERK * *

Re:  2:99-cr-00627

True and correct copies of the attached were either mailed or faxed by the
clerk to the following:

    US Probation
    DISTRICT OF UTAH
    ,
    JFAX 9,5261136

    USMS
    DISTRICT OF UTAH
    ,
    JFAX 9,5244048

    Mr. James C. Bradshaw, Esq.
    BROWN BRADSHAW ANDERSON & MOFFAT LLP
    10 W BROADWAY STE 210
    SALT LAKE CITY, UT  84101
    JFAX 9,5325298

    Elizabethanne C Stevens, Esq.
    US ATTORNEY'S OFFICE
    ,
    JFAX 9,5245985